583 A.2d 796

**TONY SAVATT, INC.**

v.

**LATROBE BREWING CO., Labatt Importers, Inc., Labatt's U.S.A., Inc., and John P. O'Connell, Appellants.**

Superior Court of Pennsylvania.

Argued Aug. 22, 1990.

Filed Nov. 2, 1990.

Reargument Denied Jan. 14, 1991.

298

Peter Hearn, Philadelphia, for appellants.

Jon G. Hogue, Pittsburgh, for appellee.

Before POPOVICH, JOHNSON and HESTER, JJ.

JOHNSON, Judge:

This is an appeal from a final decree issued pursuant to the 1980 amendments to the Liquor Code enjoining appellant Latrobe Brewing Company/Labatt's U.S.A. (Latrobe) from terminating Tony Savatt, Inc. as its primary distributor within Savatt's territory. We decide that the contract at issue constituted Savatt as primary distributor, and that therefore the "good cause" requirement for termination of a primary distributor mandated in the Liquor Code at 47 P.S. § 4–431(d)(1) was not applied retroactively to this case. We also decide that the good cause for termination requirement is not an unconstitutional exercise of the police power of the Commonwealth to regulate sales of liquor. Hence, we affirm.

Savatt has been a beer distributor in Allegheny County since 1935. Latrobe is a manufacturer of malt or brewed beverages, principally Rolling Rock beer. In 1939 Latrobe formed Rock Beer Distributing Company as the primary distributor for Rolling Rock beer in Allegheny County. In 1977, the owner of Rock Beer Distributing divided his Allegheny County customers geographically into two groups and sold the rights to service these groups to two different entities, one of which was Savatt. It is not disputed that between 1977 and 1980, Savatt served as

Latrobe's exclusive distributor in the territory which it had purchased from Rock Beer Distributing; Latrobe sold beer only to Savatt in the territory, and Latrobe gave instructions to customers in Savatt's territory that those customers must buy only from Savatt.

In 1980 the general assembly amended the Liquor Code by structuring the relationship between brewers and beer distributors:

All distributing rights as hereinabove required shall be in writing, shall be equitable in their provisions and shall be substantially similar as to terms and conditions with all other distributing rights agreements between the manufacturer giving such agreement and its other importing distributors and distributors shall not be modified, cancelled, terminated or rescinded by the manufacturer without good cause....

47 P.S. § 4–431(d)(1). The amendments provided, in addition, that:

The provisions of this subsection shall not apply to Pennsylvania manufacturers whose principal place of business is located in Pennsylvania unless they name or constitute a distributor or importing distributor as a primary or original supplier of their products subsequent to the effective date of this act, or unless such Pennsylvania manufacturers have named or constituted a distributor or importing distributor as a primary or original supplier of their products prior to the effective date of this act, and which status is continuing when this act becomes effective.

47 P.S. § 4–431(d)(5). The amendments gave the courts of common pleas the power to enjoin the modification, recision, cancellation or termination of an agreement between a manufacturer and distributor if the manufacturer's action adversely affects the distributor. 47 P.S. § 4–431(d)(4). These amendments were signed into law on June 22, 1980, to become effective in sixty days. They became effective on August 21, 1980. *See* 1 Pa.C.S. § 1908, Computation of Time.

In 1980, after passage of the amendments, Latrobe became concerned about its ability to "come up with meaningful territorial descriptions" of each distributor's responsibility in the sixty-day period between passage and the effective date of the amendments. Testimony of James L. Tito, Vice–President, Latrobe Brewing Company, N.T. at 47. Latrobe was concerned that the effect of the act would be to freeze overlapping territories in place; it was not concerned with assuming primary distributorship themselves: "[w]e had no intention of selling direct at any time." *Id.* As an "aborted attempt," N.T. at 44, to deal with the territory problem in the context of the new amendments, Latrobe drew up a form agreement providing that "this writing names and constitutes [name of distributorship] as a secondary importing distributor ... for our Rolling Rock Premium Beer." Latrobe sent this agreement to each of its primary distributors in Pennsylvania. N.T., March 21–22, 1989 at 18–19. The specific agreement between Latrobe and Savatt was executed on August 21, 1980.

Notwithstanding the agreement's language, Latrobe assured Savatt both orally and in writing that the agreement would effect no change in their actual relationship and that their business relationship would proceed as before with Savatt as primary distributor in fact. N.T., March 21–22, 1989 at 25–32, 61–62; letter of August 6, 1980 from James L. Tito, Vice President, Latrobe Brewing Company. Latrobe continued to sell its beer only to Savatt when selling within Savatt's territory, continued to instruct customers located in the territory to buy only from Savatt, and made no direct sales itself within the territory. N.T. at 34, 55–56, 61–62, 81, 108. On October 7, 1987, John Labatt, Inc. acquired Latrobe from Sundor Group Insurance. Following this, Savatt once more was assured by the new ownership that nothing would change with regard to its distribution relationship with the brewer. N.T., at 81–82. On July 28, 1988, Labatt hand-delivered a letter to Savatt terminating Savatt's right to distribute Rolling Rock beer. N.T., at 84–86.

Savatt commenced this action in equity on August 12, 1988 seeking to enjoin its termination as a distributor of Rolling Rock beer. On February 21, 1989 a special injunction was entered with the parties' consent. Savatt then requested a preliminary injunction which the court denied because Savatt failed to demonstrate that he would incur irreparable harm without it. On July 11, 1989, the Honorable John L. Musmanno conducted a final hearing and on August 2, 1989 issued an Adjudication and Decree Nisi granting Savatt a permanent injunction. On November 3, 1989 the court entered the final decree from which Latrobe now appeals.

Latrobe avers that the chancellor improperly concluded that Savatt had been "named and constituted" as a primary distributor under its 1980 contract with Latrobe. In the alternative, Latrobe contends that, assuming that Savatt was designated a primary distributor, the court improperly applied the good cause for termination requirement retroactively, causing an unconstitutional interference with the contract. Latrobe further argues that, should we find that Savatt was constituted as a primary distributor and if we should find no retroactive application, the "good cause" requirement is, in itself, an unconstitutional exercise of the Commonwealth's police power.

■ Our scope of review on an appeal from a final decree upholding the grant of a permanent injunction is limited. We are bound to accept the chancellor's findings of fact and accord them the weight of a jury verdict where supported by competent evidence. We are not, however, bound by conclusions drawn from these facts or by legal conclusions and may reverse for abuse of discretion or error of law. *Den–Tal–Ez, Inc., v. Siemens Capital Corporation*, 389 Pa.Super. 219, 566 A.2d 1214 (1990). Concluding that competent evidence supported the chancellor's findings and that he properly applied the law to these facts, we affirm the order upholding the injunction.

Preliminarily, we decide that the Liquor Code amendments at issue do not unconstitutionally overstep the Commonwealth's police power to regulate the sale of liquor. A strong presumption of constitutionality attaches to acts of the General Assembly, and a heavy burden of persuasion falls on the party seeking to rebut the presumption. *Consumer Party of Pennsylvania v. Commonwealth,* 510 Pa. 158, 507 A.2d 323 (1986). Most important, control of the sale and use of alcoholic beverages is absolutely within the police powers of the Commonwealth. *Commonwealth, Liquor Control Board v. Starr,* 13 Pa.Commw. 415, 318 A.2d 763 (1974), *affirmed* 462 Pa. 124, 337 A.2d 914 (1975). An individual has no constitutional right to engage in the business of selling alcoholic beverages in the Commonwealth; therefore, the conduct of the liquor business in the Commonwealth is lawful only to the extent and manner permitted by statute. *Replogle v. Commonwealth, Pennsylvania Liquor Control Board,* 514 Pa. 209, 523 A.2d 327 (1987).

The Twenty-first Amendment to the United States Constitution, which repealed the Eighteenth Amendment, also established broad authority in the states to regulate, limit and absolutely prohibit traffic of any kind in alcoholic beverages within their boundaries. *Replogle,* 514 Pa. at 214, 523 A.2d at 330:

> While the States, vested as they are with general police power, require no specific grant of authority in the Federal Constitution to legislate with respect to matters traditionally within the scope of the police power, the broad sweep of the Twenty-first Amendment has been recognized as conferring something more than the normal state authority over public health, welfare, and morals.

*California v. LaRue,* 409 U.S. 109, 114, 93 S.Ct. 390, 395, 34 L.Ed.2d 342, 349–350 (1972), *rehearing denied* 410 U.S. 948, 93 S.Ct. 1351, 35 L.Ed.2d 615 (1973). In no other area is a state's exercise of its police power more plenary than in the regulation and control of the use and sale of alcoholic beverages. *In re Tahiti Bar, Inc.,* 395 Pa. 355, 150 A.2d

112 (1959), *appeal dismissed by Tahiti Bar, Inc. v. Pennsylvania Liquor Control Board,* 361 U.S. 85, 80 S.Ct. 159, 4 L.Ed.2d 116 (1959).

The purpose of enacting liquor regulation legislation has always been to restrain and to discourage the sale of liquor, not to promote it. *Commonwealth, Pennsylvania Liquor Control Board v. Backer,* 113 Pa.Commw. 373, 537 A.2d 100 (1988). As remedial civil legislation, the Liquor Code is to be liberally construed to effectuate its purpose to protect public health, welfare, peace and morals. 47 P.S. § 1-104(a); *Slovak-American Citizens Club of Oakview v. Commonwealth, Pennsylvania Liquor Control Board,* 120 Pa.Commw. 528, 549 A.2d 251 (1988). In other words, the Liquor Code is not, as Latrobe characterizes it, a generic economic regulation of the relationship between contracting parties. Rather, it is an exercise of police power for the protection of the public welfare based upon the constitutional delegation to the states of plenary power to control the sale and use of alcoholic beverages.

The Pennsylvania Supreme Court has articulated two views regarding the proper constitutional analysis for reviewing a claim that a provision of the Liquor Code is unconstitutional. In *Pennsylvania Liquor Control Board v. SPA Athletic Club,* 506 Pa. 364, 485 A.2d 732 (1984), the court reviewed the Liquor Code restrictions under the lowest level of scrutiny under a Fourteenth Amendment analysis, whether there is a rational basis for the regulation at issue. In *Replogle v. Commonwealth, Pennsylvania Liquor Control Board,* our Supreme Court, noting that "[a] classification recognized by the Twenty-First Amendment cannot be deemed forbidden by the Fourteenth[,]" *California v. LaRue,* 409 U.S. at 115, 93 S.Ct. at 395, 34 L.Ed.2d at 350, saw no need for any kind of Fourteenth Amendment analysis and simply found that the regulation at issue was a valid exercise of the Commonwealth's police powers.

Assuming that we must find a rational basis for the good cause for termination requirement, we conclude that such a basis exists. "This deferential standard mandates only that

the statutory classification be 'reasonable' and 'rest upon a difference having a fair and substantial relation to the object of the legislation.'" *Estate of Cox*, 327 Pa.Super. 479, 487, 476 A.2d 367, 371 (1984) (citations omitted). The good cause requirement for termination articulated in 47 P.S. § 4–431(d)(1), along with the other requirements in that section, is designed to eliminate favoritism by manufacturers toward certain distributors, so as to prevent unfair competition. *Centre Beverage Company, Inc., v. Miller Brewing Company*, 779 F.2d 168 (3d Cir.1985).

■ Unlike the overly specific liquor code provision successfully challenged in *United States Brewers' Association, Inc., v. State*, 192 Neb. 328, 220 N.W.2d 544 (1974), a case cited by Latrobe, the provision at issue here is both reasonable and rational. "Good cause" is broadly defined as "the failure by any party to an agreement, without reasonable excuse or justification, to comply substantially with an essential, reasonable and commercially acceptable requirement imposed by the other party under the terms of an agreement." 4–431(d)(1). This requirement is appropriate to address the legislature's desire to prevent termination for the sole purpose of controlling the market, e.g., for price-fixing purposes. We agree with the trial court that, considering the broad and reasonable definition of good cause, it does not impose an undue burden for brewers to fulfill. Given that the general purpose of the Liquor Code is to restrain and discourage the sale of liquor, not to promote it, that the states' police power is plenary in liquor regulation, and that the Code is not a mere general economic regulation, we conclude that Latrobe has not sustained its burden of persuading us that § 4–431(d)(1) is unreasonable, unduly oppressive, or unrelated to the legislative purpose. Where a legitimate purpose has been identified and a rational relationship between that purpose and the means chosen to foster it has been established, our inquiry into whether the statute violates the equal protection clause is at an end. *Cox, supra*. We hold that 47 P.S. § 4–431(d)(1) is constitutional.

Next, we agree with the chancellor that the August 21, 1980 contract between Latrobe and Savatt "named and constituted" Savatt as a primary distributor, despite the language in the written agreement. Adjudication and Decree Nisi, August 2, 1990, Conclusions of Law numbers 10 and 11. We addressed this precise issue in *Matt Lamb & Sons, Inc. v. Christian Schmidt Brewing Company*, 336 Pa.Super. 341, 485 A.2d 836 (1984). In *Matt Lamb*, Schmidt, a Pennsylvania brewer, in anticipation of the new amendments, executed an agreement with Lamb, the distributor, on August 27, 1980 "designating Lamb as a 'secondary importing distributor' of Schmidt's products, and designating itself as primary or original supplier of Schmidt's products." *Matt Lamb*, 336 Pa.Super. at 347, 485 A.2d at 839. The chancellor found that Lamb executed the agreement with the belief that it would not change its business relationship with Schmidt. As in the present case, the parties had had a relationship in which Lamb had been a primary distributor, and, after the new agreement, which had been formulated in response to the new amendments, the relationship did not change substantively. After the agreement, Lamb continued to purchase Schmidt's products directly from Schmidt, and to the knowledge of Lamb's president, Schmidt did not sell directly to any other purchasers in Lamb's territory.

Subsequently, Schmidt sought to terminate Lamb as distributor. Relying upon the principle that the performance of the parties under an agreement is the strongest indication of what a writing means, *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736 (1978), we affirmed the chancellor's finding that the letter agreement had no effect on the status of Lamb as primary distributor:

> We would accept [Schmidt's] argument and grant them the literal meaning of their August 11, 1980 letter, if the letter did accomplish what it claimed. However, even Schmidt agrees that the relationship between the parties was substantially the same prior to and after the letter, which Lamb signed in acceptance. Lamb, in fact, testi-

fied that he accepted the purported new arrangement only because of assurances that it would not change things.

*Matt Lamb,* 336 Pa.Super at 350, 485 A.2d at 836. We held that because Lamb continued to purchase products directly from Schmidt with virtually no change in the parties' relationship, despite the designation of Lamb as a "secondary importing distributor," Lamb continued to be "named and constituted" a primary distributor by Schmidt, thus triggering the "good cause" requirement for termination. The same fact pattern pertains in our case. Latrobe's officers testified that the relationship between the parties was the same prior to and after the agreement and that Latrobe assured Savatt that this relationship would remain the same. Savatt entered into the agreement only because of these assurances, which he specifically sought. The chancellor's conclusion that Savatt was never "named and constituted" a secondary distributor is based upon competent evidence.

Having decided that the agreement at issue, which was executed on the day that the amendments became effective and which was drafted in response to the amendments, constituted Savatt as a primary distributor, we reject Latrobe's argument that the "good cause" for termination requirement has been applied retroactively where retroactive application would work a due process violation and that was not expressly intended by the general assembly. Prior to the effective date of the amendments, a brewer could terminate a distributor without notice and without cause shown. The amendments imposed upon out-of-state brewers the good cause for termination of distributor requirement but exempted in-state brewers unless the brewer constituted the distributor as primary, or unless the Pennsylvania brewer had constituted the distributor as primary before the effective date of the amendments, and this status continued when the amendments become effective.

In *Rudolph Rosa, Inc. v. Latrobe Brewing Company,* 347 Pa.Super. 551, 500 A.2d 1194 (1985) Latrobe had consti-

tuted Rosa as a secondary distributor pursuant to the amendments. That Rosa was a secondary distributor was not at issue. Pursuant to 4–431(d)(5), then, Latrobe was exempted from the good cause requirement with regard to terminating Rosa, which Latrobe then did without cause. Rosa argued that 47 P.S. § 4–492(19) (effective August 22, 1980), which makes it *unlawful* for a manufacturer to terminate a distributor without good cause, overrides the 4–431(d)(5) exemption. The narrow issue before us was whether the legislature intended § 4–492(19) to reinstate the "for cause" requirement to situations that it had specifically exempted from this requirement in § 4–431(d)(5). *Rosa*, 347 Pa.Super. at 561, 500 A.2d at 1199. We held that this interpretation of the purpose of § 4–492(19) would effect an impermissible retroactive application of the good cause requirement upon the "secondary distributor" contract formed pursuant to 4–431(d)(5), absent express legislative intent, which we found lacking.

*Rosa* does not and could not stand for the general proposition that *any* retroactive application of the Liquor Code amendments is constitutionally prohibited. First, the legislature, in § 4–431(d)(5), provided a specific retroactive application of the good cause requirement: if a distributor had been primary before the amendments, and this relationship continued beyond the effective date of the amendments, then the good cause requirement applies to the contract, even though it was formed years before the amendments were contemplated. As we pointed out in *Rosa*, in postponing the effective date of the amendments for sixty days, the legislature gave brewers notice and opportunity to bring their distributor contracts in line with the statute. *Rosa*, 347 Pa.Super. at 563, 500 A.2d at 1200. During the sixty days, brewers could either re-classify a distributor from primary to secondary, which would manifest an intent to take advantage of the exemption, or they could continue their relationship with the primary distributor as primary distributor, thus manifesting an intent to assume the burden of the good cause requirement.

In any event, retroactive application in general is not *per se* prohibited. It is prohibited only if it offends due process, and it offends due process only if, balancing the interests of both parties, the application would be unreasonable. *Krenzelak v. Krenzelak*, 503 Pa. 373, 469 A.2d 987 (1983). The retroactive application is unreasonable only if it impairs a vested right. *Id.* If, as is true in the field of liquor regulation, there is no constitutional right to engage in the liquor business, the conduct of which is lawful only to the extent permitted by statute, the concept of retroactivity that takes away a right has no application. As we quoted above, "[a] classification recognized by the Twenty–First Amendment cannot be deemed forbidden by the Fourteenth[,]" *California v. LaRue*, 409 U.S. at 115, 93 S.Ct. at 395, 34 L.Ed.2d at 350.

The evidence amply supported the finding that Latrobe intended that Savatt remain a primary distributor pursuant to the new contract initiated with Savatt. Latrobe may not have it both ways by having Savatt believe that the contract continued his status as a primary distributor while at the same time allowing Latrobe to terminate Savatt because of what amounts, after considering the expressed understanding between the parties and the course of dealing, to an empty technicality. Although Latrobe alleges that the distributorship contract in *Rosa* is from the same batch of letter agreements drafted by Latrobe for its distributors as was signed by Savatt in this case, this allegation, even if true, would not mandate the same result, as Latrobe suggests. Rosa's status as primary or secondary distributor was not at issue, and, without discussing the facts underlying the new contract, we assumed that Latrobe intended to designate and succeeded in designating Rosa as a secondary distributor. *Rosa*, 347 Pa.Super. at 557, 500 A.2d at 1197. Nothing in *Rosa* conflicts with our decision today that Savatt was actually constituted as primary distributor and that the amendments have not been applied retroactively.

For all the foregoing reasons, we affirm the order of the trial court issued pursuant to 47 P.S. § 4–431(d)(4) enjoining

Latrobe from terminating its relationship with Tony Savatt Distributors.

Order affirmed.